United States District Court
Middle District of Florida
Jacksonville Division

**HARTFORD FIRE INSURANCE COMPANY,**

   *Plaintiff, Counter-Defendant,*

v.                                              **NO. 3:18-cv-485-J-39PDB**

**WELLS FARGO BANK, N.A.,**

   *Defendant, Counterclaimant.*

_____

### Report & Recommendation on Motion to Dismiss (Doc. 24)

Hartford Fire Insurance Company brings this declaratory-judgment action to resolve a dispute over coverage for claims in a recently settled class action. Doc. 1. Wells Fargo Bank, N.A., responds with an answer and counterclaims for declaratory judgment and breach of contract ("mirror images" of Hartford's claim). Doc. 18.

Before the Court is Hartford's motion to dismiss the counterclaims. Doc. 24. Relying on Federal Rule of Civil Procedure 12(b)(6), Hartford contends the counterclaims state no claim on which relief may be granted because a financial-services exclusion in the policies bars coverage. Doc. 24. Wells Fargo responds it states a claim and the exclusion is inapplicable. Doc. 27. Hartford replies to the contrary. Doc. 30. The motion was referred to the undersigned for a report and recommendation on an appropriate resolution. Doc. 28.

## I.    Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

In deciding a Rule 12(b)(6) motion, a court may consider only the pleading allegations, anything attached to the pleading, anything extrinsic to the pleading central to the claim and without challenge to its authenticity, and any judicially noticeable facts. *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). The court must accept factual allegations as true and construe them in the light most favorable to the nonmovant. *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).

## II.   Background

To its counterclaims, Wells Fargo attaches the complaint in the underlying class action, Doc. 18-1, and the insurance contracts, Doc. 18-2. This background is from those documents, Docs. 18-1, 18-2; admissions in the answer to allegations in the complaint, Docs. 1, 18; and Wells Fargo's factual allegations in the counterclaims, Doc. 18 at 10–14 ¶¶ 5–16. Reliance on the class-action complaint and the policies is appropriate because Wells Fargo attached them to its pleading. *See Osheroff*, 776 F.3d at 811. The parties agree. Doc. 24 at 8; Doc. 28 at 2–5.

### A.   *Insurance Contracts*

Hartford issued a series of commercial general liability policies to nonparty Fidelity National, Inc., and its predecessor, nonparty Lender Processing Services, Inc. Doc. 1 at 5–6 ¶ 20; Doc. 18 at 3–4 ¶ 20; Doc. 18-2. Nonparty ServiceLink Field Services, LLC—a subsidiary of Fidelity—provided field services for Wells Fargo under a series of agreements. Doc. 1 at 2 ¶ 2; Doc. 18 at 2 ¶ 2. For the motion to dismiss, Hartford assumes without admitting Wells Fargo is an "insured" under these policies. Doc. 24 at 4 n.2; Doc. 30 at 4.

The policies generally provide Hartford will pay sums "the insured" becomes obligated to pay as damages for "bodily injury," "property damage," and "personal and advertising injury" and must defend "the insured" against any suit seeking those damages. Doc. 1 at 7 ¶ 23; Doc. 18 at 4–5 ¶ 23, 12–13 ¶ 10; Doc. 18-2 at 7, 11, 170,

174, 252, 256, 351, 355, 456, 460, 559, 563, 664, 668. The policies are subject to various limits from $1 million to $10 million and various deductibles from $50,000 to $500,000. Doc. 1 at 6 ¶ 21; Doc. 18 at 4 ¶ 21.

The policies define "insured" as "any person or organization qualifying as such under Section II—Who Is An Insured." Doc. 18-2 at 7, 170, 252, 351, 456, 559, 664. Included under "Section II—Who Is An Insured" are these provisions:

### 6. Additional Insureds When Required By Written Contract, Written Agreement Or Permit

The following person(s) or organization(s) are an additional insured when [Fidelity has] agreed, in a written contract [or] written agreement … that such person or organization be added as an additional insured on [Fidelity's] policy[.] …

### f. Any Other Party

Any other person or organization who is not an insured under [certain paragraphs], but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by [Fidelity's] acts or omissions or the acts or omissions of those acting on [Fidelity's] behalf:

(1) In the performance of [Fidelity's] ongoing operations;

…

(3) In connection with "[Fidelity's] work" and included within the "products-completed operations hazard", but only if

(a) The written contract or agreement requires [Fidelity] to provide such coverage to such additional insured; and

(b) This Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard[.]"

3

Doc. 18-2 at 16, 18, 179, 181, 261, 263, 360, 362, 465, 467, 568, 570, 673, 675 (emphasis in originals).

Through endorsements, the policies include a financial-services exclusion, which is the sole basis for the motion to dismiss:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" resulting from the rendering of or the failure to render financial services by any insured to others. For the purpose of this exclusion, financial services include but are not limited to …
>
> 3. Lending, or arranging for the lending of, money, including credit card, debit card, leasing or mortgage operations or activities or interbank transfers;
>
> 4. Repossessing of real or personal property from a borrower or acting as an assignee for the benefit of creditors[.]

Doc. 18-2 at 48, 130, 209, 298, 396, 501, 610, 716.

## B.   *Underlying Class Action*

In December 2016, in a Washington state court, Valerie Rhodes filed a putative class action against Wells Fargo. Doc. 18-1. Under "Nature of the Case," she alleged:

> 1.1     Wells Fargo, one of the largest lending institutions in America, contracts with and employs agents throughout Washington to provide property inspection and preservation services for homes located in Washington that are in default under the terms of their loan agreement, but which homes have not been foreclosed upon.
>
> 1.2     Wells Fargo derives its purported authority to enter such homes via a form deed of trust provision that is present in all of its contracts with borrowers.
>
> 1.3     That provision states, if the borrower abandons or vacates the residence, then the lender (Wells Fargo) may do whatever is reasonable and appropriate to protect the lender's interest in and secure the residence, including by entering the residence to change the locks (the "Entry Provision").

4

1.4     Thus, upon a borrower's default, but prior to the conclusion of any foreclosure proceedings, Wells Fargo or its agents act to determine the occupancy status of properties, secure properties deemed vacant or abandoned, remove personal property therefrom, and provide other so-called "property preservation services."

1.5     Such services include but are not limited to: forcibly entering the property to change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and turn on or off utilities.

1.6     During such entry, borrowers' real and personal property is often damaged or converted by Wells Fargo or its agents.

1.7     On July 7, 2016, in *Jordan v. Nationstar Mort., LLC*, [185 Wash.2d 876, 889, 374 P.3d 1195, 1202 (2016) (en banc)], the Washington State Supreme Court deemed the same form deed of trust provisions relied upon by Wells Fargo unenforceable as contrary to Washington State law. … *Jordan* erodes any purported legal justification for Wells Fargo or its agents' presence on borrowers' properties for the performance of such preservation activities.

1.8     However, setting aside the unenforceability of the form deed of trust provisions, the provisions as written do not permit Wells Fargo or its agents[] to damage, destroy, or convert borrowers' property, and/or deny the full use and enjoyment of borrowers' real and/or personal property prior to the completion of foreclosure.

1.9     Nevertheless, Wells Fargo has a common course of conduct whereby it wrongfully and forcibly enters borrowers' properties prior to completion of a foreclosure to perform destructive and disruptive acts, including destroying the borrower's existing lock(s), removing the destroyed lock(s) from the home, damaging property inside the home, and removing personal property from the home.

1.10    Thus, not only do Wells Fargo and/or its agents have no legal right to be present on borrowers' properties in advance of the completion of foreclosure proceedings, but Wells Fargo and/or its agents regularly act beyond the scope of the unenforceable and illegal form deed of trust provisions they rely upon.

Doc. 18-1 at 2–4 ¶¶ 1.1–1.10.

Elsewhere in the complaint, Rhodes alleged:

5

4.8    Frequently, Wells Fargo or its agents inaccurately determine the occupancy status of a home.

...

4.10   Upon entry, Wells Fargo instructs its agents to remove all personal property and belongings from the home, an act commonly known as "trashing out" the property.

4.11   After a borrower's home has been trashed out, Wells Fargo does not require its agents to store, preserve, or otherwise track the items that were trashed out of the home. Wells Fargo and/or its agents have no policy or procedure for returning "trashed out" personal property to borrowers.

4.12   Wells Fargo instructs its agents to place their own locks and lock boxes on the borrower's home and post a notice upon the borrower's home instructing the borrower to contact Wells Fargo for access to the home.

4.13   When Wells Fargo learns that a homeowner wants access to his or her home, Wells Fargo does not: (a) immediately provide access to the homeowner; (b) remove the locks that it had placed on the home; (c) restore the homeowner's locks to the home; or (d) return the locks to the homeowner.

4.14   When Wells Fargo learns that a homeowner wants personal property that was removed from the home returned, Wells Fargo does not return the personal property.

4.15   When Wells Fargo learns that a homeowner wants the damage to the home repaired, Wells Fargo does not repair the damage.

...

5.9    To gain entry to the Rhodes Property, Wells Fargo or its agent damaged the Rhodes Property, including damaging locks and a door[].

...

6.11   As such, Representative Plaintiff Rhodes and all members of the class own or owned real property in Washington State, [and], prior to completion of any judicial or non-judicial foreclosure, had their property entered upon by Wells Fargo or its agents for purposes of conducting property preservation services upon their property, had their real or

6

personal property located thereon damaged and/or removed by Wells Fargo or its agents, and were denied the full use and enjoyment of their real and/or personal property by Wells Fargo or its agents.

…

6.23.4 <u>The Conduct of Wells Fargo's Agents in Entering and Damaging or Converting Borrowers' Property</u>. Plaintiff will be able to establish the elements of her claims using evidence common to the class because, as to all putative class members, Wells Fargo's agents acted similarly while on borrowers' properties; namely, they: (a) committed unauthorized entry upon borrowers' properties; (b) conducted unlawful forcible entries involving damage to existing locks, doors and/or windows; (c) damaged and converted personal property found thereon; and (d) interfered with borrowers' full use and enjoyment of their properties. This theory is common to all putative class members and does not involve individualized inquiries.

…

7.2   As detailed by the Washington Supreme Court in *Jordan v. Nationstar Mortgage*, prior to the completion of any foreclosure proceedings, the borrower has the exclusive right to possess their property, and Wells Fargo has no legal right to be there. … Therefore, Wells Fargo's entry upon borrowers' properties is an invasion that affects the borrower's interest in their exclusive possession of the property.

7.3   Wells Fargo's intent to invade borrowers' possessory interests is demonstrated by its claimed authority purportedly granted in its form deed of trust provisions, which claim to permit such entries in the event of default or abandonment of properties—which the Washington Supreme Court recently invalidated.

…

7.6   It was reasonably foreseeable that Wells Fargo's unauthorized and unlawful entries onto borrowers' properties in advance of the conclusion of any foreclosure proceedings would invade borrowers' possessory interests in those properties.

Doc. 18-1 at 8–9 ¶¶ 4.8, 4.10–4.15, 13 ¶ 5.9, 18 ¶ 6.11, 22 ¶ 6.23.4, 24 ¶¶ 7.2, 7.3, 25 ¶ 7.6 (emphasis in original). Rhodes alleged similar facts personal to her. Doc. 18-1 at 12–15 ¶¶ 5.1–5.17.

Based on the allegations, Rhodes asserted claims of common-law trespass, common-law conversion, statutory trespass, and violations of state consumer protection law. Doc. 18-1 at 24–32.

Wells Fargo removed the case to federal court. *See Rhodes v. Wells Fargo Bank, N.A.*, No. 2:17-cv-93-SMJ (E.D. Wash.).

In December 2018, following a fairness hearing, the court entered final judgment, certifying a class and approving a settlement with a common fund of $26,305,000. No. 2:17-cv-93 (Doc. 108).

## C.    *Demand for Defense and Indemnification*

In September 2017 (between the December 2016 filing of *Rhodes* and its December 2018 settlement), under the agreements governing the provision of field services by ServiceLink (the subsidiary of Fidelity) for Wells Fargo, Wells Fargo demanded from Fidelity defense and indemnification for the *Rhodes* claims.[1] Doc. 1 at 2 ¶ 2; Doc. 18 at 2 ¶ 2.

## D.    *This Action*

In April 2018, Hartford brought this action for declaratory judgment, seeking a judicial determination of the parties' respective rights and obligations under the policies for the *Rhodes* claims. Doc. 1 at 14–15 ¶¶ 45–52.

In the complaint, Hartford contends it has no duty to defend or indemnify Wells Fargo because Wells Fargo is not an "insured" under the policies; *Rhodes* does not seek damages for "bodily injury," "property damage," or "personal and advertising injury" arising from a covered "occurrence"; coverage is precluded to the extent Wells

---

[1] On the same day that Hartford filed this action, Hartford filed a similar, separate action against Fidelity and ServiceLink. *See* Case No. 3:18-cv-486. Early on, Hartford voluntarily dismissed that action without prejudice. Doc. 9 (3:18-cv-486).

Fargo failed to timely notify Hartford of *Rhodes* or otherwise comply with conditions precedent to coverage; and several exclusions bar coverage, including the financial-services exclusion. Doc. 1 at 14–15 ¶¶ 48–51.

Through its counterclaim for declaratory judgment, Wells Fargo too seeks a judicial determination of the parties' respective rights and obligations under the policies for the *Rhodes* claims. Doc. 18 at 15–16 ¶¶ 24–30. Through its counterclaim for breach of contract, Wells Fargo also seeks damages for alleged breach of contract in failing to provide coverage. Doc. 18 at 16 ¶¶ 31–36. Contrasting Hartford's contentions, Wells Fargo contends it is an "additional insured" under the policies; *Rhodes* seeks damages for "bodily injury," "property damage," and "personal and advertising injury" arising from a covered "occurrence"; Wells Fargo complied with all conditions precedent to coverage, including by timely notifying Hartford of *Rhodes*; and Hartford has a duty under the policies to defend and indemnify Wells Fargo for the *Rhodes* claims. Doc. 18 at 15–16 ¶¶ 24–30.

## III.   Motion to Dismiss, Response, and Reply

Hartford seeks dismissal of the counterclaims based solely on the financial-services exclusion which, if applicable, would bar coverage for defense and indemnification and dispose of the action. Doc. 24. Hartford contends it is not waiving other defenses to coverage. Doc. 24 at 4 n.2.

Hartford argues the financial-services exclusion unambiguously applies as a matter of law, focusing on "financial services" and pointing to allegations in the *Rhodes* complaint that Wells Fargo is a "lender" and a "lending institution" that caused injury when it exercised the deed-of-trust provisions in the borrower contracts. Doc. 24 at 9–12. According to Hartford, "mortgage documentation and lending of money was an essential prerequisite for the injuries[.]" Doc. 24 at 9–10.

Hartford further argues the allegations in the *Rhodes* complaint "fall squarely" in the scope of "'[r]epossessing of real or personal property from a borrower or acting

as an assignee for the benefit of creditors.'" Doc. 24 at 11 (quoting Doc. 18-2 at 48, 130, 209, 298, 396, 501, 610, 716). Hartford points to the allegations that Wells Fargo, before foreclosures, forcibly entered properties to change locks, replace or board doors and windows, and remove borrowers' personal property, and the allegations that Wells Fargo's entry invaded the borrowers' interest in exclusively possessing their property. Doc. 24 at 11 (citing Doc. 18-1 at 3, 18, 24, 25 ¶¶ 1.4, 1.5, 6.11, 7.2, 7.3, 7.6).

Wells Fargo responds the Court should deny the motion to dismiss because Wells Fargo alleges facts to establish coverage and the exclusion is inapplicable. Doc. 27 at 7–17.

Wells Fargo contends the motion "fundamentally misstates" its claim for coverage. Doc. 27 at 8. Wells Fargo explains that, while the motion focuses on allegations in the *Rhodes* complaint about Wells Fargo's purported provision of financial services, the coverage provisions and exclusions apply to actions of Fidelity as the named insured, and Wells Fargo is covered as an "'additional insured'" for "'property damage'" caused "'in whole or in part'" by Fidelity's "'acts or omissions'" in the performance of Fidelity's "'ongoing operations.'" Doc. 27 at 8–9 (quoting Doc. 18 at 12 ¶ 9). Wells Fargo observes that, although the *Rhodes* complaint does not name Fidelity, it includes allegations based on actions of Wells Fargo or its agents ("i.e., Fidelity"). Doc. 27 at 10.

Wells Fargo focuses on Fidelity's provision not of "financial services" but of "property preservation services." Doc. 27 at 10. Wells Fargo contends the *Rhodes* complaint has no allegation the property damage was caused by Fidelity's provision of financial services (or even Wells Fargo's provision of financial services), arguing, "Rather, the allegations relate to Wells Fargo's (and its agent's) property preservation practices" that took place before foreclosures. Doc. 27 at 12–13.

10

Wells Fargo further argues Hartford's interpretation of the exclusion is "impermissibly broad" and would render coverage to Wells Fargo illusory because Wells Fargo is without doubt a lending institution. Doc. 27 at 14.

Hartford replies Wells Fargo "does not seriously dispute that it provided financial services (i.e., issued mortgages)" to the *Rhodes* class members, that *Rhodes* arose out of those financial services, and that Wells Fargo directed Fidelity to enter the class members' properties after they defaulted on their mortgages. Doc. 30 at 3.

Hartford replies Wells Fargo's contention that Wells Fargo's own conduct is irrelevant because coverage depends on Fidelity's actions is "misplaced" because the policies include no such limitation. Doc. 30 at 3. Hartford continues, "Wells Fargo ignores that, with respect to whether the [exclusion] applies, it is the language of the exclusion itself that controls," the "exclusion expressly applies to damage resulting from the rendering of or failure to render financial services 'by **any insured** to others,'" and if "the scope of the exclusion were limited to damage resulting from Fidelity's actions, the exclusion would simply refer to the rendering of financial services by 'the named insured.'" Doc. 30 at 4 (quoting Doc. 18-2 at 48; emphasis in Doc. 30).

Hartford further replies the result is the same—application of the exclusion and no coverage—even if the focus is on Fidelity's conduct because *Rhodes* alleges invasion of borrowers' property interests as a step toward or actual repossession, and, moreover, such actions "clearly occurred in the course of mortgage operations and pursuant to deeds of trust in the mortgages, because of the borrowers' failure to pay." Doc. 30 at 6–7.

Hartford replies coverage is not illusory. Doc. 30 at 8–10. Hartford argues, "The exclusion does not eliminate all coverage just because Wells Fargo is a 'lending institution,' it simply reflects that Hartford issued policies that cover certain injuries and damage that result from negligence but not from operating a financial services

11

business. Consequently, the Hartford Policies provide coverage, subject to their terms, for injury or damage that does not result from providing financial services." Doc. 30 at 9. As an example, Hartford states: "If Fidelity's negligence in preparation for, or during, [post-sale inspection and preservation services] resulted in bodily injury (*e.g.*, injury that occurred as the result of a slip-and-fall accident at Fidelity's office), coverage might be available." Doc. 30 at 9.

## IV. Jurisdiction

A pleading must contain "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1).

The pleadings contain the following allegations and answers to the allegations. Hartford alleges it is a Connecticut corporation with its principal place of business in Connecticut. Doc. 1 at 2 ¶ 6. Wells Fargo admits the allegation on information and belief. Doc. 18 at 2 ¶ 6. Hartford alleges Well Fargo is a national banking association with its main office in South Dakota and its principal place of business in California. Doc. 1 at 2 ¶ 7. Wells Fargo admits it is a national banking association chartered in South Dakota and has offices in California but otherwise denies the allegations. Doc. 18 at 2 ¶ 7. Hartford alleges the costs of defending and indemnifying Wells Fargo in *Rhodes* exceed $75,000. Doc. 1 at 3 ¶ 9. Wells Fargo admits the allegation. Doc. 18 at 2 ¶ 9. Hartford alleges policy limits exceeding $75,000 even after deductibles. Doc. 1 at 6 ¶ 21. Wells Fargo contends the policies speak for themselves and otherwise denies the allegation. Doc. 18 at 4 ¶ 21. Both parties contend the Court has jurisdiction under 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000. Doc. 1 at 3 ¶¶ 8, 10; Doc. 18 at 2 ¶¶ 8, 10.

Federal courts have an independent obligation to ensure subject-matter jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). "When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof." *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010). "And where they

are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence." *McNutt v. Gen. Motors Acceptance Corp. of Indiana, Inc.*, 298 U.S. 178, 189 (1936).

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act does not confer jurisdiction on a federal court. *Borden v. Katzman*, 881 F.2d 1035, 1037 (11th Cir. 1989) (citing *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667 (1950)). Thus, an action under the act must have an independent source of jurisdiction. *Id.*

The parties' stated basis for jurisdiction, § 1332(a), provides federal district courts with diversity jurisdiction over any civil action between "citizens of different States" in which the amount in controversy exceeds $75,000, 28 U.S.C. § 1332(a).

A national banking association is a citizen of the state in which it is "located." 28 U.S.C. § 1348. A national banking association is "located" where it maintains its main office. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006).

The value of declaratory relief is the "'value of the object of the litigation' measured from the plaintiff's perspective." *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000) (quoted authority omitted). "[W]hen an insurer seeks a judgment declaring the absence of liability under a policy, the value of the declaratory relief to the plaintiff-insurer is the amount of potential liability under its policy." *First Mercury Ins. Co. v. Excellent Computing Distribs., Inc.*, 648 F. App'x 861, 865 (11th Cir. 2016) (citing *Stonewall Ins. Co. v. Lopez*, 544 F.2d 198, 199 (5th Cir.1976)).

Here, the Court has jurisdiction under § 1332(a) to decide the dispute because, as the parties assert, they are diverse (Connecticut on one side; South Dakota and

California on the other)[2] and the amount in controversy exceeds $75,000 (the costs of defense and indemnity after deductibles, as well as the policy limits, exceed $75,000). *See* Doc. 1 at 3 ¶¶ 8, 10; Doc. 18 at 2 ¶¶ 8, 10.

Although Wells Fargo denies its main office is in South Dakota and denies its principal place of business is in California, Doc. 18 at 2 ¶ 7, Wells Fargo does not otherwise challenge the alleged jurisdictional facts, agrees the Court has diversity jurisdiction, and in other actions represents its main office is in South Dakota, including in its removal notice in *Rhodes*. *See Rhodes v. Wells Fargo Bank, N.A.*, No. 2:17-cv-93-SMJ (Doc. 1 at 4 ¶ 7); *Gilder v. Wells Fargo Bank, N.A.*, No. 2:17-cv-00211-RWS-JCF, 2018 WL 3702423, at *3 (N.D. Ga. May 23, 2018) (unpublished), *R&R adopted*, 2018 WL 3699011 (June 21, 2018). In other recent federal actions, courts have found Wells Fargo has its main office in South Dakota and its principal place of business in California. *Gilder*, 2018 WL 3702423, at *3; *Reano v. Wells Fargo Bank, N.A.*, No. 14-60581-CIV-COHN-SELTZER, 2017 WL 8772501, at *3 (S.D. Fla. Nov. 21, 2017) (unpublished).

The Court's jurisdiction over this action appears clear without a need for evidence.

---

[2]All courts of appeals that have addressed the issue hold that the location where a national banking association maintains its main office is its exclusive place of citizenship. *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218–19 (2d Cir. 2016); *Rouse v. Wachovia Mortg.*, FSB, 747 F.3d 707, 708 (9th Cir. 2014); *Wells Fargo Bank, N.A. v. WMR e–PIN, LLC*, 653 F.3d 702, 706–10 (8th Cir. 2011); *accord Amer. Sr. Servs. of CA, Inc. v. Wells Fargo Bank, N.A.*, No. 8:15-cv-1804-T-35AEP, 2015 WL 12915729, at *2–3 (M.D. Fla. Nov. 23, 2015) (unpublished). An argument can be made that a national banking association's principal place of business is also its place of citizenship. *See Wells Fargo, N.A.*, 653 F.3d at 715–20 (Murphy, J., dissenting). The Eleventh Circuit has not addressed the issue. It is unnecessary to address the issue here because there is no suggestion that Wells Fargo's principal place of business is Connecticut, where Hartford maintains its citizenship. *See generally* Docs. 1, 18.

### V.     Merits

#### A.     *Applicable Law*

In a diversity action, a federal district court must apply the substantive law of the forum state, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), including its conflict-of-law principles, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Florida conflict-of-law principles, the law of the place where a contract is executed or to be performed determines its nature, validity, and interpretation. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008); *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997). When neither side raises a conflict-of-law issue in a diversity action, the applicable law is the law of the state in which the federal court sits. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).

Both sides cite and rely on the substantive law of Florida concerning the interpretation of insurance contracts. *See* Doc. 24 at 8; Doc. 27 at 6. Neither side raises a conflict-of-law issue, points to a choice-of-law or conflict-of-law provision in the insurance contracts, or articulates where the insurance contracts were executed or to be performed.[3] Provided with and discerning no reason to do otherwise, this report and recommendation applies the substantive law of Florida concerning the interpretation of insurance contracts. Unless otherwise stated, the federal cases cited below apply Florida law.

---

[3]Hartford alleges a substantial part of the events giving rise to the dispute occurred in the Middle District of Florida, Jacksonville Division. Doc. 1 at 3 ¶ 11. Wells Fargo responds the allegation is a legal conclusion to which no response is required, the law concerning venue speaks for itself, and Wells Fargo otherwise denies the allegation. Doc. 28 at 3 ¶ 11. The policies reflect that Hartford issued policies to Lender Processing and Fidelity at Jacksonville addresses. *See, e.g.*, Doc. 18-2 at 2, 39, 244.

**B.**    *Interpretation of Insurance Contracts Under Florida Law*

"Under Florida law, … the interpretation of the provisions of an insurance contract is a matter of law to be decided by the court." *Adelberg v. Berkshire Life Ins. Co.*, 97 F.3d 470, 472 (11th Cir. 1996).

An insurer's duty to defend its insured against a legal action arises when the complaint in the legal action alleges facts that "fairly and potentially bring the suit within policy coverage." *Jones v. Fla. Ins. Guar. Ass'n, Inc.,* 908 So. 2d 435, 442–43 (Fla. 2005).

To determine if an insurer has a duty to defend its insured against a legal action, a court considers only the terms of the insurance contract and the allegations in the underlying complaint. *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 536 (Fla. 1977). If the alleged facts differ from the actual facts, the alleged facts control. *Jones*, 908 So. 2d at 443. "If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *Trizec Props., Inc. v. Biltmore Const. Co., Inc.*, 767 F.2d 810, 811–12 (11th Cir. 1985).

In contrast, to determine if an insurer has a duty to indemnify its insured for damages from a legal action, a court considers the terms of the insurance contract and the actual facts, which often develop during discovery or trial. *Alicea Enterprises, Inc. v. Nationwide Ins. Co. of Am., Inc.*, 252 So. 3d 799, 802 (Fla. 4th DCA 2018).

An insurer's duty to defend is broader than its duty to indemnify. *Keen v. Fla. Sheriffs' Self-Ins. Fund*, 962 So. 2d 1021, 1024 (Fla. 4th DCA 2007). Accordingly, an insurer has no duty to indemnify if it has no duty to defend. *Travelers Prop. Cas. Co. of Am. v. Salt 'N Blue LLC*, 731 F. App'x 920, 922 (11th Cir. 2018) (citing *Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 422 (Fla. 3d DCA 1995)).

Exclusionary clauses are generally disfavored. *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006). Still, if the allegations in the underlying complaint show an exclusion applies, the insurer has no duty to defend or indemnify, *Auto-Owners Ins. Co. v. Elite Homes, Inc.*, 676 F. App'x 951, 954 (11th Cir. 2017) (citing *Keen*, 962 So. 2d at 1024), and dismissal under Rule 12(b)(6) is appropriate, *Goldberg v. Nat'l Union Fire Ins. Co. of Pitts., PA*, 143 F. Supp. 3d 1302, 1305 n.3 (S.D. Fla. 2015) (citing cases).

If an insurer relies on an exclusion to deny coverage, the insurer must demonstrate the allegations in the underlying complaint are "cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Beaver*, 466 F.3d at 1296 (quoted authority omitted). If there is doubt about the duty to defend, the matter is resolved in favor of the insured. *Salt 'N Blue LLC*, 731 F. App'x at 922–23 (citing *Marr Invs., Inc. v. Greco*, 621 So. 2d 447, 449 (Fla. 4th DCA 1993)).

To interpret an insurance contract, a court must use "accepted rules of construction." *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007). The court must start with the plain language of the insurance contract, as bargained for by the parties. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

"When interpreting insurance contracts," the Florida Supreme Court and lower courts turn to "references commonly relied upon to supply the accepted meaning of words," like dictionaries. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291–92 (Fla. 2007); *see, e.g., Altman Contrs., Inc. v. Crum & Forster Specialty Ins. Co.*, 232 So. 3d 273, 277 (Fla. 2017); *Gov't Employees Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017); *Allstate Ins. Co. v. Ortho. Specs.*, 212 So. 3d 973, 978 (Fla. 2017); *Brill v. Indianapolis Life Ins.*, 784 F.2d 1511, 1513 (11th Cir. 1986).

A court must read a "policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Anderson*, 756 So. 2d at 34; *accord* Fla. Stat.

§ 627.419(1) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto."); *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1074–75 (Fla. 1998) (observing court must review exclusions with other provisions "in pari materia").

Language in an insurance contract is ambiguous if it is "susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage[.]" *State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004). Language is not necessarily ambiguous merely because it lacks a definition, is complex, or requires analysis for its application. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165–66 (Fla. 2003).

If language is ambiguous, the court must "strictly" construe the language against the insurer. *Sebo v. Am. Home Assurance Co.*, 208 So. 3d 694, 697 (Fla. 2016). If an exclusion is ambiguous, the court will construe it "even more strictly" against the insurer. *Id.* But this rule of construction applies "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986); *accord Deni Assocs. of Fla., Inc. v. State Farm Fire & Casualty Ins. Co.*, 711 So.2d 1135, 1138 (Fla. 1998) (applying limitation in context of exclusion). This rule of construction "does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Pridgen*, 498 So. 2d at 1248. If the language "is not ambiguous or otherwise susceptible of more than one meaning, the court's task is simply to apply the plain meaning of the words and phrases used to the facts before it." *Natl' Union Fire Ins. Co. v. Carib Aviation, Inc.*, 759 F.2d 873, 876 (11th Cir. 1985).

A policy is illusory and thereby unenforceable "if there is an internal contradiction that completely negates the coverage it expresses to provide." *Warwick Corp. v. Turetsky*, 227 So. 3d 621, 625 (Fla. 4th DCA 2017); *accord Interline Brands,*

*Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014). Examples of an illusory policy include a policy that covers intentional torts but excludes intended acts, a policy that covers advertising injury but excludes advertising injury, and a policy that covers parasailing but excludes watercrafts. *Turetsky*, 227 So. 3d at 625. If an exclusion does not "completely swallow" the insuring provision, the policy is not illusory, even if it is a significant exclusion. *Id.*

## C.   *Analysis*

To decide the motion to dismiss, Doc. 24, two contentions may be disposed of at the outset, one from each side.

First, Wells Fargo's contention that Hartford "fundamentally misstates" Wells Fargo's claim for coverage, Doc. 27 at 8, is not dispositive. As Hartford replies, even if Wells Fargo is an insured under the provision providing coverage for Fidelity's acts or omissions, *see* Doc. 18-2 at 16, 18, 179, 181, 261, 263, 360, 362, 465, 467, 568, 570, 673, 675, the financial-services exclusion applies to damages "resulting from the rendering or the failure to render financial services **by any insured** to others"—not by just the named insured (Fidelity)—and the policies include no limitation requiring consideration of only Fidelity's actions or inactions to determine application of the exclusion, Doc. 30 at 4; *see* Doc. 18-2 at 48, 130, 209, 298, 396, 501, 610, 716 (quoted; emphasis added).

Second, Hartford's contention that all damages described in the *Rhodes* complaint resulted from "repossessing" borrowers' property or undertaking "mortgage operations" fails. *See* Doc. 24 at 11. With respect to "repossessing," *Jordan* held secured lenders cannot gain possession of encumbered property before foreclosure, 374 P.3d at 1200, and the *Rhodes* complaint cites and incorporates *Jordan*, *see, e.g.*, Doc. 18-1 at 3–4 ¶ 1.7, 9–12 ¶¶ 4.17–4.25, 24 ¶¶ 7.2–7.3, 28 ¶ 9.1.2. But to determine a duty to defend, all allegations in the *Rhodes* complaint must be considered. *See Lenox Liquors*, 358 So. 2d at 536. Those allegations include pre-

foreclosure and pre-repossession actions to preserve property, which are actions that precede and fall short of actions to repossess the property.[4] *See, e.g.*, Doc. 18-1 at 2–3 ¶ 1.1 (describing Wells Fargo's use of agents to "provide property inspection and preservation services" for property not yet foreclosed upon); 3 ¶ 1.3 (describing deed-of-trust provision that allows Wells Fargo to take reasonable actions to protect its interest in and secure the property); 3 ¶¶ 1.4, 1.5, 1.7 (describing "property preservation services" by Wells Fargo or its agents that include replacing doors and windows and draining water from pipes). With respect to "mortgage operations," Hartford proposes too broad of an interpretation by reading out of the exclusion the modifiers "rendering" and "lending." The exclusion is written not to apply to damages resulting from any type of "mortgage operations" but to apply to damages resulting from the rendering of financial services, which include mortgage lending services. *See* Doc. 18-2 at 48, 130, 209, 298, 396, 501, 610, 716.

Disposing of those contentions and observing that Wells Fargo does not seriously dispute that it rendered financial services to the property owners in *Rhodes* by providing them mortgage loans, the issue dispositive of the motion to dismiss becomes whether the damages alleged in the *Rhodes* complaint "resulted from" the rendering of those services. See Doc. 18-2 at 48, 130, 209, 298, 396, 501, 610, 716 (quoted).

The insurance contracts do not define "resulting from," and the parties do not provide (and the undersigned could not find) any Florida state case defining "resulting from" in either an exclusion or a coverage provision. *See generally* Docs. 24, 27, 30. In accordance with Florida law, resort to dictionaries to supply the accepted meaning of "resulting from" is warranted. *See, e.g., Garcia*, 969 So. 2d at 291; *Altman*,

---

[4]Given that exclusionary clauses are generally disfavored, *see Beaver*, 466 F.3d at 1296, it would be inappropriate to read "include but are not limited to" expansively to encompass actions that follow loan services but precede and fall short of actions to repossess the property. Hartford does not really base its arguments on the "include but are not limited to" language. *See generally* Docs. 24, 30.

232 So. 2d at 277; *Macedo*, 228 So. 3d at 1113; *Ortho. Specs.*, 212 So. 3d at 978; *see also Southern Own. Inc. Co. v. Roberts Sand Co., LLLP*, No. 4:15CV612-WS/CAS, 2016 WL 10647096, at *4 (N.D. Fla. July 13, 2016) (unpublished) (applying Florida law and turning to dictionary to supply accepted meaning of "resulting from" in an exclusion).

"Result" means "to proceed or arise as a consequence, effect, or conclusion." Merriam-Webster Online, www.merriam-webster.com/dictionary/resulting (last visited Feb. 11, 2019); *accord Webster's Third New International Dictionary*, 1937 (1986) ("to proceed, spring, or arise as a consequence, effect, or conclusion" and "something that results as a consequence, effect, issue, or conclusion"); *Black's Law Dictionary*, 1509 (10th ed. 2014) ("consequence, effect, or conclusion"). "Result" also means "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion." *Black's Law Dictionary*, 1509.

According to the allegations in the *Rhodes* complaint, the following series of events occurred with respect to Valerie Rhodes (and a similar series of events occurred with respect to all putative class members, *see* Doc. 18-1 at 17–18 ¶¶ 6.9–6.13). Wells Fargo loaned Rhodes money, she provided her real property as security for the loan, and she agreed to a deed-of-trust provision allowing Wells Fargo to take actions to protect its interest in the property if she abandoned it. Doc. 18-1 at 12–13 ¶¶ 5.2–5.4. She defaulted on the loan but did not vacate or abandon the property. Doc. 18-1 at 13 ¶¶ 5.6, 5.8. Before initiation of foreclosure proceedings, Wells Fargo or its agents entered the property, damaged and changed locks, damaged doors and boarded up a door, removed personal property, and left a notice to call to access the property. Doc. 18-1 at 13–14 ¶¶ 5.5–5.6, 5.9–5.10. Rhodes returned, entered through a door with a lock not properly changed, and discovered the real property "winterized" and otherwise damaged and personal property gone. Doc. 18-1 at 14 ¶ 5.12. Neither Wells Fargo nor its agents repaired or reimbursed Rhodes for damage to the real property, and neither Wells Fargo nor its agents returned or replaced the personal

property. Doc. 18-1 at 14 ¶ 5.13. Wells Fargo or its agents acted both within and beyond the scope of the deed-of-trust provision. Doc. 18-1 at 4 ¶ 1.10.

It may be reasonably said these alleged damages resulted from (i.e., arose as a consequence of) Wells Fargo's rendering of financial services to Rhodes and all putative class members: but for Wells Fargo's rendering of financial services in the form of lending money to them, neither Wells Fargo nor its agents would have had reason to be on the properties and take the alleged actions.

But an accepted meaning of "result" includes a "logical … consequence." *Black's Law Dictionary*, 1509. While it arguably may be reasonably said that some alleged damages in the *Rhodes* complaint resulted from (i.e. were a logical consequence of) Wells Fargo's rendering of financial services to Rhodes and other putative class members (specifically, alleged damages from actions pursuant to the deed-of-trust provision in the loan documents), the same cannot be reasonably said of all alleged damages in the *Rhodes* complaint (specifically, the alleged damages from actions beyond the scope of the deed-of-trust provision). Extracontractual actions not reasonably undertaken to preserve real property serving as a security for the loans are not logical consequences of Wells Fargo's rendering of financial services.

Whether because an accepted meaning of "resulting from" includes "logical," or because "resulting from" is ambiguous and must be strictly construed ("even more strictly" construed than if in a coverage provision, *see Sebo*, 208 So. 3d at 697) against Hartford, Hartford has not demonstrated the allegations in the *Rhodes* complaint are "cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Beaver*, 466 F.3d at 1296 (quoted). To the extent there is doubt about Hartford's duty to defend—and there may well be—the doubt must be resolved in favor of Wells Fargo. *See Salt 'N Blue LLC*, 731 F. App'x at 922–23. Hartford does not contend any public policy consideration should prevail.

For its arguments, Hartford uses the terms "arising out of," "arising from," and "resulting from" interchangeably to refer to the language in the financial-services exclusion without arguing they are synonymous with "resulting from." *See* Doc. 24 at 2 ("arising from"); Doc. 24 at 7 ("arising from"); Doc. 24 at 8 ("arises out of"); Doc. 24 at 9 ("arises from" and "arises out of"); Doc. 24 at 12 ("arising from"); Doc. 24 at 12 (relying on case interpreting "arising out of"); Doc. 24 at 13 ("arises from"); Doc. 30 at 1 ("arises from"); Doc. 30 at 2 ("resulting from"); Doc. 30 at 3 ("arises out of" and "resulting from"); Doc. 30 at 4 ("resulting from"); Doc. 30 at 5 ("arise from"); Doc. 30 at 8 ("resulting from"). And Hartford relies on cases interpreting language other than "resulting from."[5] *See* Doc. 24 at 12–13 (citing *Travelers Indem. Co. of Conn. v. Attorney's Title Ins. Fund, Inc.*, 194 F. Supp. 3d 1224 (M.D. Fla. 2016) (Chappell, J.),

---

[5]Hartford also relies on *First One Lending Corp. v. Hartford Cas. Ins. Co.*, No. SACV-13-01500 AG (DFMX), 2017 WL 1018305 (C.D. Cal. Mar. 13, 2017) (unpublished), *appeal pending* No. 17-55492 (9th Cir.) (oral argument on Dec. 4, 2018), which interprets a financial-services exclusion using "resulting from."

In *First One*, the underlying lawsuit against the insured sought damages for injuries from the insured's alleged fraudulent mortgage modification scam targeting vulnerable homeowners seeking mortgage modifications through misrepresentations about the nature of its business and its affiliation with the Neighborhood Assistance Corporation of America. 2017 WL 1018305, at *2. The policy—issued by Hartford— excluded claims for injuries "'resulting from the rendering of or the failure to render financial services by any insured to others,'" including "'[p]lanning, administering, managing or advising on ... [a] Loan or Mortgage plan, fund or account.'" *Id*. at *4. The court held the exclusion applied because the injuries, including from misleading advertisements, resulted from the insured's "'rendering of or the failure to render' mortgage-related advising of others." *Id*. In a pending appeal, the insured argues, among other things, the district court rewrote the exclusion, the exclusion did not apply, and Hartford's interpretation of the exclusion would render coverage illusory. *See* Opening Brief of Appellants, No. 17-55492 (Dec. 18, 2017).

*First One* is not persuasive here because the court there applies California law, addresses different underlying factual allegations, relies on exclusion language not presented here ("[p]lanning, administering, managing or advising on ... [a] Loan or Mortgage plan, fund or account"), and provides only brief analysis with no discussion of causation. *See First One*, 2017 WL 1018305, at *2.

*aff'd* 733 F. App'x 524 (11th Cir. 2018) (unpublished),[6] *Carma Enters., Inc. v. Zurich Am. Ins. Co.*, No. 15-CV-0172-MV-KBM, 2016 WL 7494298 (D.N.M. Feb. 26, 2016) (unpublished)[7]).

"Interpreting a policy, one must look at the particular policy language utilized, not simply apply general rules. Accordingly, for example, in order to determine the scope of an exclusion or an insuring clause, one must consider whether the provision applies to injuries 'caused by,' 'caused directly or indirectly by,' 'by reason of,' 'involving,' 'in connection with,' 'related to,' 'due to,' 'based upon,' 'arising out of,' 'resulting from,' 'for,' etc." Insurance Claims and Disputes § 11:22C (6th ed.) (internal footnotes omitted).

---

[6] In *Traveler's Indemnity*, the underlying lawsuit against the insured sought damages for injuries from the insured's alleged malicious prosecution of a lawsuit to recover a sum the insured had to pay as the title insurer for fraudulently sold property. 194 F. Supp. 3d at 1227–28. The policies excluded claims "'arising out of the rendering of or the failure to render financial or professional services by any insured to others,'" defining "financial services" for any insurance contract as "'[i]nvestigating, defending, handling, adjusting, or settling any claim or suit.'" *Id.* at 1230 (internal quotation marks omitted). In deciding the insurer had no duty to indemnify, this Court observed that "the language is clear and unambiguous: claims related to the handling of insurance claims are excluded from coverage." *Id.* at 1231. This Court held the exclusion applied "in this instance" based on deposition testimony that efforts to recover money paid on claims (salvage activity) is part of the claims handling process. *Id.* at 1230–31.

[7] In *Carma*, the underlying lawsuit against the insured sought damages for injuries from the insured's alleged knowledge of illegal conduct by permitting employees to engage in the unauthorized practice of law; specifically, by permitting them to sue and move for default after a borrower missed payment or payments on a high-interest loan. 2016 WL 7494298, at *1. The policy excluded losses "incurred from 'the rendering of or the failure to render financial services by any insured to others,'" including "'[l]ending, or arranging for the lending of, money, including credit card, debit card, leasing or mortgage operations or activities or interbank transfers.'" *Id.* at *3. The court held "the allegations in the underlying complaint all arise out of [the insured's] practice of issuing loans and using non-attorney employees to bring collection actions when debtors defaulted; it is obvious that such activity falls within the ambit of the financial services exclusion." *Id.*

Hartford's reliance on language other than "resulting from" and on cases interpreting language other than "resulting from" is misplaced, particularly with respect to "arising out of." The insurance contracts here use "arising out of" in some policy exclusions but not in the financial-services exclusion (found in endorsements). *See, e.g.*, Doc. 18-2 at 8–10 (employer's liability, pollution, aircraft or watercraft, mobile equipment, damage to your product, damage to your work, damage to impaired property or property not physically injured, electronic data, employment-related practices, asbestos). The Florida Supreme Court has held that "arising out of" in an exclusion means "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having a connection with"; is "broader" than "caused by"; and does not require proximate cause (but does require more than mere coincidence between the conduct and the injury). *Taurus Holdings Inc. v. U.S. Fidelity & Guar. Co.*, 913 So. 2d 528, 539–40 (Fla. 2005). "'[A]rising out of' is not difficult to meet." *Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1350 (11th Cir. 2017). The Florida Supreme Court did not include "resulting from" among the several meanings of "arising out of" and included in a string citation to support its holding a case observing that "arising out of" has a "broader meaning" than "resulting from." *See Taurus*, 913 So. 2d at 536 (citing *Toll Bridge Auth. v. Aetna Ins. Co.*, 54 Wash. App. 400, 404, 773 P.2d 906, 908 (1989)). At a minimum, a reasonable inference from *Taurus* (as well as the insurance contracts here considering the rule of construction that different words are intended to have different meanings) is that "arising out of" and "resulting from" are not synonymous.[8]

---

[8]In *New Hampshire Ins. Co. v. Champion*, this Court, relying on a 1995 decision from a Florida district court of appeal, commented that "resulting from" and "arising out of" in an automobile coverage provision are synonymous. No: 6:12-cv-1832-Orl-22GJK, 2013 WL 12156445, at *6 (M.D. Fla. Nov. 25, 2013) (unpublished) (relying on *Heritage Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 657 So. 2d 925, 927 (Fla. 1st DCA 1995)). Insofar as the Florida district court of appeal case preceded *Taurus* and both cases interpret coverage provisions as opposed to exclusions, they are unpersuasive here.

25

Because Hartford has not demonstrated it has no duty to defend Wells Fargo in *Rhodes* based on the financial-services exclusion, denial of the motion to dismiss is warranted. *See Elite Homes*, 676 F. App'x at 954. Whether Hartford has no duty to defend Wells Fargo in *Rhodes* based on any other exclusion or defense is not presented or decided here. *See generally* Doc. 24. Whether Hartford has a duty to indemnify Wells Fargo for the *Rhodes* claims should await the development or presentation of the actual facts. *See Alicea Enterprises*, 252 So. 3d at 802.

## VI.   Oral Argument

Wells Fargo requests oral argument on the motion to dismiss, Hartford does not oppose the request, and the parties agree 30 minutes per side would suffice. Doc. 27 at 17. Due to adequate briefing, the undersigned finds oral argument unnecessary to prepare this report and recommendation but leaves the request with Judge Davis to determine whether oral argument on the motion to dismiss, this report and recommendation, and any objections and responses would be helpful.

## VII.   Recommendation[9]

The undersigned recommends denying the motion to dismiss, Doc. 24, and directing Hartford to answer the counterclaims within 21 days of the denial.

**Done** in Jacksonville, Florida, on February 14, 2019.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      The Honorable Brian J. Davis
        Counsel of Record

---

[9]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.